Filed 7/29/21  In re G.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re G.M. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>REBECCA J.,<br><br>Defendant and Appellant. | F082354<br><br>(Super. Ct. Nos. JVDP-18-000118, JVDP-18-000119)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Sophia Ahmad, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Rebecca J. (mother) challenges the juvenile court's order terminating her parental rights with respect to her two children at a Welfare and Institutions Code section 366.26[1] permanency planning hearing. Mother's sole contention on appeal is that the juvenile court erred by failing to apply the beneficial parent-child relationship exception to adoption. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Background*

On May 4, 2018, mother was pulled over for reckless driving. She was believed to be under the influence of drugs. G.M., then age two, and J.M., then age one, were both in the back seat of the vehicle. Mother admitted using methamphetamine earlier in the day and was also reportedly using hydrocodone. She admitted cocaine use the previous day and was on a methadone maintenance program.

Mother was arrested for being under the influence of a controlled substance and child endangerment. The children were initially released to a maternal aunt but returned to mother and father after they agreed to voluntary family maintenance services.

At an unannounced visit by a Stanislaus County Community Services Agency (agency) social worker on August 24, 2018, mother stated she planned to move out of the county to Merced as soon as her car was repaired. Mother admitted that she continued to use cocaine, "Benzo's" and methadone, and she was still in the methadone program, as was father. Mother refused to drug test but acknowledged she would be positive.

The family home was "very messy" and filled with food, old tools, storage bins, an ashtray lined with cigarette butts, and a cage for a pet lizard that reportedly bites. The only electricity to the home was obtained from a generator. Father was unkempt and

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

gaunt, with "pick" marks on his face.  He denied any drug use other than methadone but refused to test.

A protective custody warrant was issued for the children on August 27, 2018. When the social worker arrived to retrieve the children, the family was not home.  The parents agreed by telephone to bring the children to the agency the following day, but when they arrived, the children were not with them and the parents presented the agency with a notarized note placing the children with maternal aunt.  The parents were told that the notarized note was not effective due to the custody warrant, and the children were later brought into the agency.

### Section 300 Petition

The agency filed a section 300 petition on August 30, 2018, alleging that mother and father failed to protect the children due their substance abuse issues.

### Detention

The children were detained at the August 31, 2018 detention hearing and jurisdiction and disposition was set for October 4, 2018.

### Jurisdiction and Disposition

The report prepared for jurisdiction and disposition stated that neither parent completed a social history for the report, as both failed to appear for two separate appointments.

The children were placed in a foster home, awaiting approval of placement with maternal aunt.

Mother had a referral for substance abuse services at Stanislaus Recovery Center but failed to begin services.  She had not yet contacted Sierra Vista to begin parenting or counseling services.  Father also failed to begin services.  The parents participated in 2 two-hour visits at the agency, during which neither parent changed the children's diapers and mother was noted to have little interaction with the children.

The foster parent noted that both children exhibited aggressive behavior, hitting each other, and screaming at bedtime. G.M. would wake at night, screaming, and it would take hours for her to go back to sleep.

At the October 4, 2018 hearing, both mother and father submitted with an offer of proof. The juvenile court found the petition true, declared the children dependents, and removed them from mother and father's care. Reunification services were offered to both mother and father. A three-month interim review was set for January 15, 2019, and a six-month review for March 26, 2019.

***Three-Month Interim Review***

At the three-month interim review, it was reported that both mother and father attended most visits, which were "appropriate" except for the times mother and father argued with each other. While the children had been moved to maternal aunt's home at the end of October 2018, they had to be moved to foster care after maternal aunt found the children's behavior "too overwhelming."

***Six-Month Review***

The report prepared for the six-month review recommended that services continue for mother and be terminated for father, who was homeless and reportedly living in a local park.

Mother was living at Redwoods, a clean and sober facility, and was no longer in a relationship with father. Mother was beginning the First Step treatment program but her engagement in the program needed improvement, as she was not completing assignments and slept through class. She tested positive for illegal substances on December 7, 2018, and January 9, 2019.

Visits between mother and the children were reported as being "appropriate" and the children appeared to enjoy the visits. However, visitation reports stated that mother fed the children snacks throughout the visits. During 1 two-hour visit, she gave the

children dry Cup of Noodle soup, brown bananas, Capri Suns, cups of Jell-O, bags of chips, Lunchables, plus bottles of juice.

G.M. was receiving mental health services with a focus on decreasing irritability, frequent tantrums, and sleep disturbances.

At the six-month hearing on March 26, 2019, services were terminated for father, who was in custody. Mother received an additional six months of services.

The 12-month review hearing was set for September 19, 2019.

### 12-Month Review Hearing

The Court Appointed Special Advocate (CASA) filed a report for the 12-month review hearing in which she reported that the children moved to a new foster home in May of 2019, where they were receiving a lot of positive reinforcement and structure. The children were in preschool. G.M. had difficulty with rest periods and waiting for snack time, asking for food often. The CASA's main concern was that G.M. shut down emotionally and was unable to engage, which was observed by multiple adults in various settings. Due to extensive restorative dentistry and continued sensitivity with G.M.'s teeth, mother was asked to limit sweets and eating at the visits. Both children had difficulty after visits with mother, screaming in the car and at school.

The 12-month report recommended that services for mother be terminated and a section 366.26 hearing set. Mother had been discharged from Redwoods because she was not complying with the program rules. After a new substance use disorder assessment, it was recommended that she continue with First Step and then reenter Redwood, but at another location when there was an opening. Mother reentered Redwood on May 22, 2019 but was struggling and was placed on restriction for noncompliance. In her First Step program, mother continued to fail to complete assignments or attend regularly and did not engage in discussion until after several team meetings in August of 2019. Mother tested positive for opiates on May 7, 2019.

5.

Mother participated in weekly visitation with the children. A meeting was held in April of 2019 to discuss mother's feeding of the children during visits. The vast amounts and array of foods mother was feeding them resulted in stomachaches, vomiting and diarrhea after visits.[2] Mother improved for a while, but then reverted. In July of 2019, it was decided that mother would need to have the food she brought to the visits pre-approved. Mother brought fireworks to a visit near the 4th of July. Mother's interactions with the children were described as "sporadic" as she moved from one activity to the next quickly and frequently went to the restroom and walked the hallways. Mother was referred for a mentor parent to help with the visits.

At the contested hearing, which was eventually heard on October 25, 2019, the juvenile court granted mother's request for continued services, but she was admonished that it would be her last extension. An 18-month review was scheduled for February 21, 2020.

### *De Facto Parent Status*

On November 21, 2019, the foster parents applied for and were granted de facto parent status.

### *18-Month Review*

The report prepared for the 18-month review again recommended termination of services and setting a section 366.26 hearing.

Mother began weekly mentor parent services in August of 2019, working on providing healthy amounts of quality food, appropriate discipline, and maintaining a schedule for the children. By the middle of December 2019, mother's visits were increased to eight hours one day per week at her living facility but, as reported by the

---

**2**     The record includes the recitation of many of the snack and processed food items mother brought to various visits.

parent partner, mother reverted to overfeeding the children and being unable to appropriately discipline them or keep them on schedule. But when mother was asked to discuss these issues with the social worker, she would "disengage." Mother also struggled to comply with the rules at the living facility. Because mother could not adequately demonstrate her ability to care for the children during the day, the agency did not consider overnight visits.

The CASA report for the 18-month review stated that G.M. and J.M. had improved at preschool until October 2019, when they did well in the morning but, by afternoon, were inappropriate and aggressive with the other children and impossible to control. While J.M. was allowed to stay the entire day, G.M. was only allowed the mornings.

An emergency meeting was held at the end of December 2019, due to a sharp increase in behavioral issues with both children. During the meeting, the children were observed to move freely between mother and the foster parents but went to the foster parents for help with something or for reassurance. Mother was observed giving the children a snack, even though they had just eaten breakfast.

According to the CASA, both G.M. and J.M. exhibited a lot of anxiety before visits but were usually happy to see mother when they arrived. J.M., in particular, had difficulty going from the foster parent to mother and vice versa.

While the CASA noted that the children's behavior had improved in foster care, they quickly regressed when visits with mother at Redwoods started. In addition, following visits with mother, the school gave regular reports of disruptive and concerning behaviors for both children. The CASA did not believe mother would be able to parent without regular intervention and recommended visits be decreased and the children have a permanent plan in their foster home.

The visitation notes state that the foster parents and mother had a notebook that traveled with the children, to inform the other by recording activities, naps and food given to the children. Mother recorded having given the children healthy food, while G.M. would report having been given a lot of sugary snacks and processed foods.

A contested hearing was set for March 23, 2020.

An addendum report filed by the agency stated that G.M. would be dismissed from school effective March 26, 2020, due to her behavior.

On March 6, 2020, J.M. had a meltdown at bedtime and stated he did not want to visit mother, whom he referred to as "other mommy." He told his foster mother that he wanted "a new other mommy. I don't want that other mommy." The following day, both children fought in the car all the way to the visit.

Due to COVID-19, the hearing was trailed to May 14, 2020.

A second addendum report stated that mother was discharged from Redwoods effective March 20, 2020, for failing to follow policies and procedures. She went to live at another recovery facility, privately funded by a friend, but within a month reported needing to find another alternative program or housing.

Because in-person visitation was suspended due to COVID-19, video visitation was recommended to begin April 10, 2020. The children were not always attentive and often left the room during these video visits. The foster parent reported that the children began the COVID-19 stay-at-home order having difficulty but resolved by week three. However, when told they would have a video visit with mother, the two "flipped a switch" and began fighting. During the video visit, J.M. wet his pants, even though he had gone to the bathroom just prior to the visit.

The foster mother reported that several weeks later, G.M. had a difficult night, yelling and crying in her sleep. She would say that she missed mother and asked when they would visit, but when the video visit took place, G.M. and J.M. would both talk to

the foster parent during the visit about what they wanted to do when the video visit was over.

The hearing was again trailed to July 13, 2020, in hopes that in-person testimony could take place.

A third addendum report was filed stating that mother had had a disagreement at her current living facility and had moved into a new residence. She was working at a convenience store.

Video visits improved due to structure set up by the foster parent, but the children still had behavioral issues before and after the calls, with J.M. screaming, hitting, and spitting and G.M. shutting down and being aggressive towards J.M. During one call, mother questioned the composition of a family picture G.M. was drawing. Mother then described family to G.M. as herself, the children, and her new "roommate," which totally confused G.M., who shut down and stared at the table.

The CASA filed an addendum report which stated that, due to COVID-19 restricted movements, G.M. had become a bit more settled, although J.M. was a bit under stimulated. The CASA noted that the children had now been dependents for almost two years and needed stability. They were very attached to the foster family and needed the stability mother could not provide.

A contested hearing was finally held August 10, 2020. The juvenile court requested briefing on two issues[3] and set the matter over for decision on August 20, 2020. The juvenile court then issued a lengthy written opinion on September 2, 2020, in which it terminated mother's reunification services and set a section 366.26 hearing for

---

[3]    The parties subsequently submitted briefs on two issues: (1) whether services could be extended past the 24 month limits; and (2) whether the juvenile court could consider the children's relationship with the foster parent.

December 21, 2020. At mother's request, the children were to be made available for a bonding study.

### Section 388 Petition

On December 7, 2020, mother filed a section 388 petition requesting an additional six months of reunification services. The petition was summarily denied.

### Section 366.26 Hearing

The report prepared for the section 366.26 hearing recommended that mother's and father's parental rights be terminated and that the children be placed for adoption. The children were deemed to be adoptable and the current foster family wished to adopt them.

The report stated that during the once a month video visits, the children were active but at times left the room. Mother did, however, engage with the children by reading them books and singing them songs. The children's participation was described as ranging from "good" to "distracted." During one visit, mother told the children she was pregnant and that they were going to have a baby sister, which mother had been advised not to discuss with the children.

On December 21, 2020, mother requested a contested hearing and the matter was continued to February 1, 2021.

At the February 1, 2021 hearing, mother appeared in person; father appeared by telephone from prison. Mother made an offer of proof that, if called to testify, she would testify that she loved her children very much and that there was a strong bond between her and the children. Mother provided no other evidence. Father also made an offer of proof that he loved his children and did not want his rights terminated.

Following closing argument, the juvenile court found that mother failed to demonstrate the beneficial parent-child relationship exception to adoption because any

detriment from ceasing visits was outweighed by the children's need for permanence. Mother's and father's parental rights were terminated.

## DISCUSSION

Mother argues the juvenile court erred by failing to find the beneficial parental relationship exception (or parent-child relationship exception) to adoption applied. We find no error.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child.... *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include the beneficial parental relationship exception, wherein the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The beneficial parental relationship exception to adoption is an *exception* to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) It "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In*

11.

*re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 (*Autumn H.*).)  The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

The first element of the beneficial relationship determination asks the "straightforward" question "whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C., supra*, 11 Cal.5th at p. 632.)  Courts should concentrate on whether "[v]isits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent' " as the focus throughout the beneficial relationship analysis "is on the best interests of the child."  (*Ibid.*; see also *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

As for the second element, the parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Caden C., supra*, 11 Cal.5th at p. 632, quoting *Autumn H., supra,* 27 Cal.App.4th at p. 576.)  The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern."  (*Caden C., supra,* at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C., supra*, 11 Cal.5th at p. 633.)  Under this element, the court is again guided by the child's best interest, but in a "specific way:  it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even

12.

considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Caden C.*, *supra*, at p. 633.)

We review the first two elements, consistent visitation and the existence of a beneficial relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Id.* at pp. 639-640.)

Consideration of the third element also involves numerous explicit or implicit findings—including specific features of the child's relationship with the parent, the harm associated with losing those features, whether an adoptive placement would offset or counterbalance those harms, and specific benefits of adoption based on characteristics of the child —that are reviewable for substantial evidence. (*Caden C., supra,* 11 Cal.5th at p. 640.) However, the ultimate decision, "weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home[,] ... is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

Here, as to the first element, there is no dispute that mother maintained consistent visitation with G.M. and J.M. Moreover, as argued by mother, that contact likely developed some level of positive, emotional attachment from child to parent.

Further, under the second element, while the contact with mother likely developed some level of positive, emotional attachment from child to parent, there is simply no evidence that the children had such a significant, positive emotional attachment to mother that they would benefit from continuing that relationship. Given their young age and the fact that they had been out of mother's custody for over two years, it is difficult to describe that attachment as substantial at this juncture. By the time of the section

366.26 hearing, G.M. and J.M. had been out of mother's custody for more than half their lives. They looked to their foster parents as their parents and sought reassurance from them. During the three-month period that the children had day-long visits with mother at Redwoods, their negative behaviors increased dramatically. In contrast, during the physical lockdown of COVID-19, when the children were only able to visit with mother via video, their behaviors improved with the structure and stability the caregivers provided.

The juvenile court here focused on the third element, "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra,* 11 Cal.5th at p. 633.) Mother's counsel argued at the section 366.26 hearing that, while the children were connected to their current caregivers, "they are also very connected to their mother and maintaining that parental relationship is important to children as they grow."

The juvenile court disagreed, determining that severance of the parent-child relationship would not be detrimental because any benefit G.M. and J.M. derived from their relationship with mother was "outweighed by their need for permanency." The court continued, stating, "[w]hat these children need is permanency, structure. And although family reunification is always our first goal, again, it is very clear that remaining where they are and this permanency of adoption is what's in the best interests of the children." There is simply no evidence that the children had such a significant and positive emotional attachment to mother that they would be harmed to any significant extent should the attachment be severed, especially when balanced against the benefit of an adoptive home.

The juvenile court was well within the boundaries of its discretion in finding that any detriment in terminating mother's parental relationship with G.M. and J.M. was

outweighed by the benefits of adoption, and we disagree with mother's argument to the contrary.

## **DISPOSITION**

The orders of the juvenile court are affirmed.

SMITH, J.

WE CONCUR:

DETJEN, Acting P.J.

FRANSON, J.